|   |   |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| RENOVATE AMERICA, INC., | CASE NO. 19-CV-1456-GPC(WVG) |
|---|---|
| Plaintiff, | ORDER ON DISCOVERY DISPUTE REGARDING DEPOSITION OF MELINDA MARGOLIES ESQ. AND PRODUCTION OF DOCUMENTS |
| v. | |
| LLOYD'S SYNDICATE 1458; | [Doc Nos. 43-45.] |
| Defendant. | |

In this insurance case, Plaintiff alleges claims for breach of contract and breach of covenant of good faith and fair dealing and seeks declaratory relief and to recover the costs incurred for defense counsel's services arising from two underlying litigations covered by insurance policies issued by Defendant or its agents. Plaintiff additionally seeks to recover damages for bad faith such as attorney fees required to prosecute this action. Plaintiff seeks to depose Melinda Margolies, an attorney who works at the same law firm that represents the defendant in this case. Plaintiff also seeks documents in her possession that it claims are related to its bad faith claim because they evidence Defendant's faulty claim review process. Plaintiff contends that while Margolies is an attorney, she was not acting in that capacity for a variety of reasons when she initially received the claims at issue here, continued to analyze

and process the claims before this action commenced, and continues to do so now. As such, her role effectively was that of a claims adjuster—not an attorney—who is not entitled to the protections of the attorney-client privilege or work-product doctrine.

Defendant objects that Plaintiff's request is based on "its own unsupported theory that Margolies was Underwriters' 'main claims adjuster,' despite the fact that Underwriters have identified the actual claims adjusters in discovery." (Doc. No. 44 at 2.) Defendant invokes the attorney-client privilege and work-product doctrine as to any communications Margolies had with Defendant and to all documents in her possession.

However, the evidence before the Court demonstrates (1) that Margolies acted for all intents and purposes as Defendant's claims adjuster (at least with respect to the two specific claims at issue here); (2) that she acted as the primary—if not sole—claims adjuster; and (3) that Plaintiff's theory is supported by the deposition transcripts and other claims-related evidence it submitted to the Court. And although Margolies is indeed an attorney at the same law firm that represents Defendant in the instant case, that relationship on its own is not dispositive given that the dominant nature of Margolies's relationship with Defendant from the beginning of the claims process was that of a claims adjuster.

## I.  BACKGROUND

The Court recounts the detailed and well-written summary of facts in Judge Curiel's Order denying Defendant's motion to dismiss:

> Renovate is a Delaware corporation with its headquarters in San Diego, California. Renovate provides services for homeowners, including the administration of residential Property Assessed Clean Energy programs for government entities under the Home Energy Renovation Opportunity ("HERO") program. As part of its insurance portfolio, Renovate maintains a professional liability insurance covering liabilities that it may face based on its administration of loan programs. Lloyd's, through its agent Euclid, issued the relevant

2

professional liability policy to Lloyd's with a policy period of at least May 27, 2017 to May 27, 2018 (the "Policy").

Plaintiff filed the Complaint on August 2, 2019. According to the Complaint, the Policy covers costs that Renovate would incur from defending against claims for, inter alia, "actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act." Plaintiff alleges that the Policy requires Lloyd's to pay defense costs while the underlying claims are being litigated. Under the Policy, coverage is limited to $2,500,000 and Renovate assumes a $250,000 retention, which increases to $500,000 for class actions. Any defense costs incurred by Renovate count against the retention amounts.

Between January of 2018 and April of 2018, Renovate was served in two separate lawsuits in California state court (the "Underlying Actions"): *All Pro Installation v. Claude Rowe et al.*, Case No. 37-2016-00042327, California Superior Court, County of San Diego (the "*Rowe* Action") and *Reginald Nemore et al. v. Renovate America, Inc.*, Case No. BC701810, California Superior Court of California, County of Los Angeles (the "*Nemore* Action"). In the *Rowe* Action, defendants served a cross-complaint on Renovate on January 23, 2018 for alleged elder abuse and other harms due to Renovate's administration of the HERO programs. In the *Nemore* Action, the plaintiffs served Renovate on April 16, 2018, and in their complaint they allege that participants of the HERO programs also suffered elder abuse and various other harms due to Renovate's administration of the program.

On April 14, 2018 and May 1, 2018 respectively, Renovate tendered both *Nemore* and *Rowe* actions to Lloyd's, seeking full coverage including payment of their defense costs. Lloyd's did not reply to Renovate within 40 days, which Renovate alleges is the applicable period for coverage determinations. Renovate selected defense counsel and paid for its own defense costs. Renovate also used a broker to prod Lloyd's to provide a response and pay for the defense costs incurred by Renovate. Lloyd's first responded in November of 2018 by letters through counsel that acknowledged that the Underlying Actions raised the potential for coverage under the Policy, but stated that rates of Renovate's defense counsel raised issues. After Lloyd's reviewed the defense counsel invoices, Lloyd's stated that it would not pay full rates for the defense counsel services and that it may also take other deductions on the invoices.

By June 21, 2019, Renovate incurred over $750,000 in costs ($500,000 in excess of the applicable retention) from defending the Rowe action, and over $570,000 in costs ($70,000 in excess of the

applicable class action retention) from defending the *Nemore* action. At this time, Lloyd's informed Renovate that it would reduce the invoices and apply other deductions, and ultimately pay $70,000 for the *Rowe* action but pay nothing for the *Nemore* action. Renovate contested Lloyd's proposed deductions and requested that Lloyd's provide an accounting of the deductions. Renovate also stated that they still expected Lloyd's to pay the $70,000 for the *Rowe* action, and Lloyd's said that they would make a partial payment within the next one to two weeks. As of the date of filing of the Complaint, Renovate had not received any payment from Lloyd's.

Renovate alleges claims for breach of contract and breach of covenant of good faith and dealing, and seeks declaratory relief and to recover the costs incurred for defense counsel's services arising from the *Nemore* and *Rowe* litigations. Renovate additionally seeks to recover damages for bad faith such as attorney fees required to prosecute this action.

(Doc. No. 16 at 1-3 (citations to Complaint omitted).)

## II.   LEGAL STANDARD

State law governs attorney-client privilege issues in federal district courts sitting in diversity. Fed. R. Evid. 501; *Star Editorial, Inc. v. Dangerfield*, 7 F.3d 856, 859 (9th Cir. 1993). Under California law, "evidentiary privileges such as the attorney-client privilege are governed by statute." *HLC Props., Ltd. v. Sup. Ct.*, 35 Cal. 4th 54, 59 (2005). California Evidence Code section 954 confers a privilege on the client "to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer . . . ." "Confidential communications include information transmitted between attorney and client, and 'a legal opinion formed and the advice given by the lawyer in the course of that relationship.'" *Calvert v. State Bar*, 54 Cal. 3d 765, 779 (1991) (quoting Cal. Evid. Code § 952). "The attorney-client privilege attaches to a confidential communication between the attorney and the client and bars discovery of the communication irrespective of whether it includes unprivileged material." *Costco Wholesale Corp. v. Sup. Ct.*, 47 Cal.4th 725, 734 (2009).

1
2
3
4
5
6
7
8
9

"The party claiming the privilege has the burden of establishing the preliminary facts necessary to support its exercise, i.e., a communication made in the course of the attorney-client relationship." *Id.* at 733. "Once that party establishes facts necessary to support a prima facie claim of privilege, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish the communication was not confidential or that the privilege does not for other reasons apply." *Id.* (citing Cal. Evid. Code § 917(a)); *Wellpoint Health Networks, Inc. v. Sup. Ct.*, 59 Cal. App. 4th 110, 123-24 (1997).

10
11
12
13
14
15
16
17
18
19

"[T]o determine whether a communication is privileged, the focus of the inquiry is the dominant purpose of the relationship between the parties to the communication. Under that approach, when the party claiming the privilege shows the dominant purpose of the relationship between the parties to the communication was one of attorney-client, the communication is protected by the privilege." *Clark v. Sup. Ct.*, 196 Cal. App. 4th 37, 51 (2011) (citing *Costco*, 47 Cal. 4th 739-40). "[W]hen an insurer hires an attorney both to provide a legal opinion and to serve as a claims adjuster, "the court must make a determination of which purpose was primary." *McAdam v. State Nat'l Ins. Co.*, 15 F. Supp. 3d 1009, 1015 (S.D. Cal. 2014).

20

### III.  DISCUSSION

21
22
23
24
25
26
27
28

The Court's first task is to determine whether Defendant, as the party invoking the attorney-client privilege, has met its burden to establish a prima facie showing of its applicability. In doing so, the Court looks to the dominant purpose of Margolies's relationship with Defendant. Defendant provides the Court very little from which the Court can conclude that Margolies was acting as an attorney. Its briefing contains no documents or declaration from Margolies that provide any details about the nature of her activities and relationship with Defendant. Rather, Defendant's brief simply states Margolies is a partner at defense counsel's law firm,

is "outside counsel" to Defendant, and that Defendant retained Margolies and her firm "to provide coverage advice as to [Plaintiff's] submitted claims . . . ." (Doc. No. 44 at 6). With such a scant and conclusory showing, the Court is unable to conclude that Margolies's dominant relationship was that of an attorney in light of the evidence Plaintiff produced to the contrary. The Court concludes that Defendant has not satisfied its burden to establish facts necessary to support a prima facie claim of privilege. *See Costco*, 47 Cal. 4th at 733.

To the contrary, the evidence Plaintiff presented the Court establishes that the dominant purpose of Margolies's relationship with Defendant was that of a claims adjuster. This is seen from the initial point when Plaintiff tendered its claims, which was sent directly to Margolies's law firm on April 14 and 30, 2018. (Doc. No. 43-1 at 22-23.) Margolies issued at least two coverage letters on November 20 and 27, 2018. (*Id.* at 30-53.) These letters are very detailed, are addressed *directly to Plaintiff's Associate General Counsel*, and were written for the purpose of providing Plaintiff with Defendant's position on coverage for the two underlying litigation matters. The evidence also shows Margolies issuing coverage payments *directly to Plaintiff*. Although there is indication that the payments were made "on behalf of" Defendant (*id.* at 59), the Court finds it telling that someone in a purported advisory position as an attorney issued such payments at all.

Plaintiff also provided excerpts of the deposition of Evi Hava, one of the persons Defendant identified as a claim adjuster in this case. However, Hava testified that for the first year after the claims were submitted, Margolies was the only person who was working on them and that her law firm—presumably meaning her— received invoices *directly from Plaintiff* and reviewed those invoices for payment. (Doc. No. 42 at 8-9.) Not only did Hava essentially testify that she was not functionally a claims agent in this case (*see id.* at 47-48), she testified that Jim Thomas—another person Defendant identified as a claims adjuster—had "no [decision-making or] authority in terms of claims handling" and was only an

underwriter. (*Id.* at 65.) The evidence also shows that Margolies was also tracking the defense costs in the underlying litigations (*id.* at 23-26) and provided spreadsheets detailing cost rundowns (Doc. No. 43-1 at 57). Ms. Hava also testified that Margolies essentially acted autonomously from Defendant while she processed the claims and sought minimal guidance from Defendant until January 2019. (Doc. No. 42 at 28.)

Thus, the evidence Plaintiff submitted establishes that although Defendant strives to identify Margolies solely as counsel who provided legal advice, the evidence before the Court demonstrates she was functionally a claims adjuster and no one was more involved with the claims than she was.[1] The totality of the evidence establishes Margolies transcended the role of advisory legal counsel and actively managed the subject claims as an adjuster would. The fact that Margolies happens to be employed by the same law firm that now defends this case does not convert her status as a claims adjuster to that of "opposing counsel." Nor does the fact that she is an attorney do so. The law is clear that an insurer cannot shield its claims process simply by assigning an attorney to do the work of a claims adjuster. Within the context of attorneys acting as claims adjusters, the Court first looks at "the dominant purpose *of the relationship* between the insurance company and its in-house attorneys, i.e., was it one of attorney-client or one of claims adjuster-insurance corporation . . . ." *Costco Wholesale Corp. v. Sup. Ct.*, 219 P.3d 736, 746 (Cal. 2009).[2] In the end, if an animal walks like a duck and quacks like a duck, it is in fact

---

[1] Her continued involvement in management of the claims is evidence by two letters written in 2020, after this litigation commenced. (Doc. No. 43-1 at 57-58, 59.) In both letters, *Margolies* issued checks for large payments directly to either Plaintiff or its counsel for defense costs in the underlying litigations. One letter included a spreadsheet summarizing invoices and explained some details about accounting related to ongoing coverage payments.

[2] Although *Costco* involved an insurer's in-house counsel and this case involves outside counsel, this is a distinction without a difference. The *relationship* and

a duck regardless of any desire to label it a goose. Calling a duck a goose does not render the duck into a goose. Defendant has not met its burden to establish Margolies's dominant relationship with Defendant was that of an attorney. Plaintiff has shown otherwise.

Defendant contends the information Plaintiff seeks is available from other sources—namely two persons Defendant identified as the claims adjusters in this case. Defendant argues Plaintiff should have at a minimum deposed either Ms. Hava or Ms. Maru before concluding Margolies was the sole claims adjuster and seeking to depose her. However, the evidence shows Plaintiff *did* depose at least Hava via remote deposition from London, England. And Hava confirmed that Margolies was the only person who had dealt with the adjustment of Plaintiff's two claims for entirety of the first year the claims were processed (Doc. No. 42 at 4-5). Hava also confirmed that Jim Thomas, who had been identified by Defendant as a claims adjuster, was merely an underwriter who had "no authority [or decision-making] in terms of claims handling." (*Id.* at 65.) In light of Hava's testimony about the minimal extent of her own role and Thomas's total lack of claims handling authority—and in light of Hava's testimony about Margolies's extensive claims handling involvement—Plaintiff cannot be faulted for not deposing the third person identified as a claims adjuster but rather seeking to depose Margolies, the person who appears to have had the most experience handling these claims. Thus, contrary to Defendant's contention, it does not appear there is a better source than Margolies.

Although the above discussion has related to the application of the attorney-client privilege, it also bears on Defendant's assertion of the work-product doctrine. As the apparent primary person acting as the claims adjuster in this case, any

---

course of conduct in that relationship remains determinative. Otherwise, insurers could ostensibly routinely outsource claims adjustment to law firms in an effort to shield their claims processes from bad faith claims. *2,022 Ranch v. Sup. Ct.*, 113 Cal. App. 4th 1377, 1378 (2003) (holding that an insurance company cannot shield claims adjusting activities from discovery by hiring attorneys to perform them).

documents Margolies prepared in that role and during her ongoing post-litigation management of the claims were not prepared in anticipation of litigation, would have been prepared regardless of litigation during the ordinary course of handling the claims, and are outside the work-product doctrine as a result. *See generally Klee v. Whirlpool Corp.*, 251 F.R.D. 507, 511-13 (S.D. Cal. 2006).

The foregoing notwithstanding, the Court recognizes that Margolies may have been involved in post-litigation collaboration with counsel of record in this case. This collaboration could have involved litigation strategy and matters that went beyond her management of the claims. Such collaboration would seem natural given her extensive knowledge of the claims and being a member of the same law firm as litigation counsel. Obviously, any such communications and documents prepared in her role as the advisor to the attorneys of record in this case would not be subject to disclosure or deposition testimony given that they would have been made during the course of litigation by attorneys collaborating on strategy. This Order is accordingly limited solely to Margolies's handling and management of the actual claims before and after litigation commenced and shall not include discussions or documents that otherwise would not have occurred but-for the existence of this action.[3]

## IV. CONCLUSION

The Court ORDERS that the deposition of Melinda Margolies proceed and that Defendant produce documents in her possession that are responsive to Plaintiff's

---

[3] The Court will caution Defendant that it should not attempt to overbroadly withhold testimony and documents by claiming they are exempt under this paragraph. Should the Court later determine that Defendant unjustifiably applied these principles to testimony and documents that clearly were not covered, this Court will not be shy about imposing sanctions upon Defendant and its counsel. The Court finds this admonishment necessary because it appears this entire dispute over Margolies's involvement as an attorney versus a claims adjuster is obvious to the objective observer and Defendant's arguments are the ones wholly unsupported by facts and evidence. Going forward, Defendant is cautioned to not proceed in this manner as it determines which documents and information to produce.

requests for production of documents subject to the limitations set forth in this Order. The deposition shall occur on or before the close of fact discovery on September 11, 2020. The Court warns against any semantics and gamesmanship, as this Court is not shy about imposing sanctions against parties *and* attorneys who unjustifiably do not comply with discovery obligations when it is clear to the Court they should have done so.

IT IS SO ORDERED.

DATED: August 31, 2020

Hon. William V. Gallo
United States Magistrate Judge